IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JAMES A. HEAP JR., | **MEMORANDUM DECISION & ORDER** |
| Plaintiff, | |
| vs. | Case No:  2:08-CV-452 DN |
| MICHAEL ASTRUE, Commissioner of Social Security, | Magistrate Judge David Nuffer |
| Defendant. | |

Plaintiff James A. Heap Jr. filed suit seeking judicial review of the decision of the

Commissioner denying his application for disability insurance benefits under Title II of the

Social Security Act.[1]  The case is before the magistrate judge by consent of the parties under 28

U.S.C. § 636(c).  After a careful review of the entire record and the parties' submissions, the

magistrate judge concludes that the decision of the Commissioner should be affirmed.

**PROCEDURAL HISTORY**

Heap applied for benefits on March 31, 2005[2] alleging that he became unable to work on

March 7, 2005 due to a back problem.[3]  Heap's application was denied initially,[4] and on

---

[1]42 U.S.C. §§ 401-433.

[2]Tr. 63-65.

[3]Tr. 103.

[4]Tr. 47, 49-51.

reconsideration.[5]  Heap then obtained a hearing before an Administrative Law Judge (ALJ) which

was held August 3, 2007.[6]  In a written decision, the ALJ determined that Heap was not eligible

for benefits because he was capable of performing jobs that exist in significant numbers in the

national economy.[7]  The Appeals Council denied Heap's request for review, making the ALJ's

decision the final decision of the Commissioner.[8]

SUMMARY OF EVIDENCE

At the time of the ALJ's decision, Heap was 43 years old.[9]  He had an 11th grade

education and past work as a truck driver and heavy equipment operator.[10]

**A. Testimony at the Hearing**

**1.  Heap's Testimony**

Heap was laid off work in March 2005 because he had been missing too much work due

to back pain.[11]  On the days he missed work, he would spend his time at home lying on the floor

with his feet up on a chair.[12]

---

[5]Tr. 48, 55-57.

[6]A transcript of the hearing may be found in the administrative record at pages 254-315.

[7]Tr. 30.

[8]Tr. 4-6.

[9]Tr. 63.

[10]Tr. 72-79, 110.

[11]Tr. 260-61.

[12]Tr. 261.

The truck-driving job was hard on his back because of prolonged sitting, and because he had to get in and out of the truck a lot to run other equipment.[13]  In response to questioning from the ALJ about whether he would have been able to work in an office, Heap replied that he struggles with reading and would have trouble with any kind of desk job.[14]

Heap estimated that in March 2005, he would have been able to sit 30 to 45 minutes at a time.[15]  On the truck-driving job, he drove between a gravel pit and the job site in 20 to 30 minute intervals.[16]  He could stand for about fifteen to twenty minutes,[17] and walk twenty-five to thirty minutes.[18]  He could lift fifteen to twenty pounds.[19]  After walking, standing, or sitting for the specified time periods, Heap would have to change positions due to pain in his lower back that radiated down into his legs.[20]  In the last sixty days before the hearing, Heap was able to sit for twenty to thirty minutes, stand for about twenty to thirty minutes, and walk for about fifteen to thirty minutes.  He could lift about ten to twenty pounds.[21]

---

[13]Tr. 262.

[14]Tr. 262.

[15]Tr. 263.

[16]Tr. 264.

[17]Tr. 265.

[18]Tr. 266.

[19]Tr. 276.

[20]Tr. 266.

[21]Tr. 300-02.

After he quit working, Heap's pain level varied from four to seven or eight on a scale of one-to-ten.[22]  Heap stated that his pain medication helped quite a bit, by increasing his range of movement and allowing him to sit or stand for longer periods of time.  He did not have any bad side effects from the pain medication, except for a little drowsiness.[23]  At the beginning of the hearing, Heap's pain level was a three or four.[24]  After about an hour and fifteen minutes, it had increased to five or six.[25]  On questioning from his attorney, Heap testified that his pain affected his ability to concentrate, as did his pain medications.[26]

Heap went to visit his parents in southern Utah on a regular basis.  It was about a three-hour drive, and he would stop two or three times along the way for ten or fifteen minute breaks.[27]  On these trips, he and his wife would take turns driving.[28]  In March 2005, they went to Las Vegas for a wedding.  They spent the night at his parents' house, so that they did not have to make the whole trip in one day, and they made frequent stops along the way.[29]

---

[22]Tr. 267.

[23]Tr. 268.

[24]Tr. 268.

[25]Tr. 298.

[26]Tr. 293-94.

[27]Tr. 269.

[28]Tr. 294.

[29]Tr. 278-79.

In February 2006, Heap was able to get several hours of pain relief from MS Contin and Lortab.[30]  During these periods of pain relief, he would take care of his small children while his wife worked.[31]  He sometimes did a bit of housecleaning.[32]  He spent about eight hours a day watching television.  About three or four hours of the TV time were spent lying down in fifteen to thirty minute intervals.[33]

In November 2006, Heap was charged with trying to obtain Lortab illegally.[34]  Heap testified that he was not trying to get the drug for himself, but for a relative.[35]  Following this incident, Heap decided to stop narcotic pain medications altogether.[36]  At the time of the hearing, he had been off the medications for several months.[37]  Without the medications, his pain would reach a level eight more frequently.  On days when he was overactive, he would have more pain the following day.[38]  Heap testified that he walked and did stretching exercises as an alternative to the pain medication.[39]  At the time of the hearing, he was also taking amitriptyline and ibuprofen

---

[30]Tr. 271.

[31]Tr. 271-72.

[32]Tr. 272.

[33]Tr. 272-73.

[34]Tr. 285-89.

[35]Tr. 289-90.

[36]Tr. 287.

[37]Tr. 279.

[38]Tr. 280.

[39]Tr. 279-80.

for pain relief and to help him sleep.[40]  Heap had not experienced any side effects with those

medications.[41]

On a typical day, Heap would get up about 8:00 or 8:30 and prepare breakfast for his four

children.[42]  During the day, he would spend about four or five hours lying on the couch, about one

or two hours at a time.[43]  He made sure his children did their chores; he also did some dishes and

laundry, and some simple cooking.[44]

Heap testified that he had taken the children to the movies twice in the last year.  He

would sit in an aisle seat so that he could get up and move around.  He estimated that he missed

approximately ten percent of the movie taking the children to the restroom and just moving

around.[45]  He had gone camping in a camp trailer one time in the last year.[46]

Heap testified that he has good days and bad days.  On good days, he would play with his

children more, and try to do some walking and exercising.  On a bad day, he might have a hard

time getting out of bed.  He estimated that the ratio of good days to bad days was approximately

25/75.[47]

---

[40]Tr. 281.

[41]Tr. 282.

[42]Tr. 283.

[43]Tr. 284-85.

[44]Tr. 290-92.

[45]Tr. 299-300.

[46]Tr. 275, 293.

[47]Tr. 296-97.

**2. Testimony of the Vocational Expert (VE)**

The VE testified that Heap's past jobs as a truck driver and equipment operator were medium to heavy work, and were semi-skilled to skilled.[48]  The ALJ posed a hypothetical question to the VE concerning an individual who could perform work with the following limitations:

- unskilled, sedentary work with no repetitive lifting

- sit/stand option

- cannot climb flights of stairs (a few steps would be okay)

- low stress level type of job–meaning (1) low production rate type of job, (2) working only occasionally with the general public, (3) minimal contact with supervisors and coworkers, but would still have the ability to respond appropriately to supervision and coworkers, (4) would have the ability to deal with simple changes in a routine work setting

- lower concentration level (would have the ability to be alert and attentive and to perform unskilled work tasks)

- lower memory level (would have the ability to understand, remember and carry out simple instructions utilizing GED levels of one to two for math, one to two for language because of his reading disorder, and two to three for reasoning)

- ability to use appropriate judgment in making simple, work-related decisions and have only minimal changes in work instructions from week to week

- would lie down at breaks and lunch, so he would need a place where he could lie down on the floor, couch, or bench, or in his car.[49]

The VE testified that such a person would be capable of performing the jobs of semiconductor bonder, dowel inspector, and wafer breaker, all of which exist in significant numbers in the

---

[48]Tr. 305.

[49]Tr. 307-09.

national economy.[50]  In answer to a further hypothetical, the VE testified that if pain (and associated deficits in concentration, persistence and pace) caused the person to be absent from work an average of three to four days every month, and caused his work performance to be fifteen to twenty percent below average, all the jobs would be ruled out.[51]

Heap's attorney asked the VE further questions concerning Heap's mental capacity assessment which indicated that Heap was "moderately" limited in the following areas:  (1) the ability to understand and remember detailed instructions, (2) the ability to carry out detailed instructions; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to respond appropriately to changes in the work setting; and (5) the ability to set realistic goals or make plans independently of others.[52]  The attorney defined "moderate" as being "off task one-third of the time.  Or one-third of an interruption throughout the workday."[53]  The VE responded that none of the limitations would have an impact on the jobs she had identified except for of the limitation in the ability to complete a normal workday and workweek.  She testified that using the attorney's definition of "moderate," such "difficulties in sustaining a normal workday and workweek" would be inconsistent with any employment and would eliminate all jobs.[54]

---

[50]Tr. 309-10.

[51]Tr. 310.

[52]Tr. 186-87.

[53]Tr. 311.

[54]Tr. 312-14.

**B.  Medical Evidence.**

Early medical records show that Heap had a history of low back pain since at least 2001.[55]

**1.  Magnetic Resonance Imaging**

Heap had MRIs of the lumbar spine in 2000 and 2001[56] which showed degenerative disc disease with disc protrusion at L1-2, extrusion at L2-3, disc protrusion at L4-5, and L5-S1 with some compression of the thecal sac[57] (membrane surrounding the spinal cord).  The 2001 MRI showed no detrimental change since the previous MRI, and in fact, the extrusion at L2-3 had slightly decreased in size.[58]  Similarly, an MRI in 2003 showed diffuse degenerative disease with disc bulges at L2-3, L4-5, and L5-S1.  There was "moderate to significant impression on the thecal sac with canal stenosis and significant left-sided neural foraminal narrowing."  In addition there appeared to be impression on the exiting nerve root.[59]

**2.  Randy Rogers, M.D.**

On February 14, 2005, Heap saw Dr. Rogers as a new patient.  The progress notes indicate that Heap had been treated for his pain by other doctors for years, but that doctor dismissed Heap's family from treatment because of a medical malpractice lawsuit filed by a relative.[60]

---

[55]Tr. 116-19, 121-27, 129-32, 236, 247-52,  257.

[56]Tr. 116-19.

[57]Tr. 116.

[58]Tr. 117.

[59]Tr. 236.

[60]Tr. 169.

Heap complained of low back pain without radiation, and headaches.[61]  Examination of his back revealed no CVA tenderness, no scoliosis, but tenderness over the percussion area.  His neurological exam showed cranial nerves intact, and motor and sensory exam grossly intact.  Deep tendon reflexes were normal.  He was taking Lortab, MS Contin, and Motrin (ibuprofen) for pain. He had no complaints of depression, but did have some anxiety and insomnia.  Dr. Rogers' diagnosis was chronic low back pain and tobacco use disorder.[62]

In April 2005, Heap was "doing fine on the MS Contin and Lortab.   Some days worse than others."  He was smoke-free and "doing fair with anxiety."  Dr. Rogers prescribed Xanax [63]

In June 2005, Heap complained of anxiety, trouble sleeping, a numb spot on the top of his head, and numbness in his right shoulder.  Dr. Rogers' assessment was (1) anxiety with panic, (2) chronic pain syndrome–chronic low back pain, (3) dysesthesia of the scalp and right shoulder of unknown etiology.[64]

In August 2005, Heap stated that he had a "few rough days and took extra Lortab but not MS Contin."  However, he could not account for approximately ten MS Contin.  Dr. Rogers reminded Heap to be vigilant with his pain meds.  His assessment was chronic back pain.[65]

---

[61]Tr. 169.

[62]Tr. 170.

[63]Tr. 168.

[64]Tr. 163-64.

[65]Tr. 161.

In October 2005, Heap reported that he had a hard time sleeping.  Dr. Rogers' assessment was chronic low back pain and insomnia. He renewed the Lortab and MS Contin and prescribed Flexeril for sleep.[66]

In November 2005, Heap reported that he fell down and was in bed for a few days.  He was suffering more pain as a result of the fall.  Dr. Rogers' assessment was chronic low back pain and smoking.[67]

In December 2005, Dr. Rogers noted that Heap's back pain was the same with any lifting of children.  His assessment was chronic low back pain and Heap was continued on Lortab and MS Contin.[68]

In January 2006, Dr. Rogers again noted that Heap's back pain was the same with any lifting of children.  However, he had gone to the emergency room two days earlier because he was having a hard time controlling the pain.[69]

In February 2006, Heap told Dr. Rogers that he was getting eight to nine hours of pain relief with MS Contin and Lortab twice a day.  He wanted to increase the Lortab to three times a day, and Dr. Rogers consented.[70]

---

[66]Tr. 158.

[67]Tr. 157, 225.

[68]Tr. 223-24.

[69]Tr. 219, see 221-22, 233-35.

[70]Tr. 218.

In April 2006, Heap was treated in the emergency room for a possible drug overdose.  He stated that he had mistakenly taken his wife's medication instead of his own.[71]  Later in that same month, Dr. Rogers filled out some forms for the Utah Department of Workforce Services (DWS).  Dr. Rogers reported that Heap suffered from chronic low back pain[72] and that no work was recommended.[73]  Dr. Rogers stated, however that it was "hard to tell how [Heap] would do in a work situation."  Dr. Rogers was "not opposed to a rehab situation."[74]

In June 2006, Heap reported that he fell down some stairs at home, injuring his back and stomach.[75]  X-rays showed degenerative disc disease at L2-3 and L4-5 causing degenerative scoliosis.[76]  Examination showed normal deep tendon reflexes, negative straight leg raise testing, sensory-motor functioning intact, tenderness to percussion/palpation, and good strength.  Dr. Rogers prescribed extra Lortab for the injury.[77]

On July 11, 2006, Dr. Rogers filled out another form for DWS indicating that Heap suffered from chronic low back pain, and that no work was recommended.[78]  However, in

---

[71]Tr. 208-11, 230-32.

[72]Tr. 213.

[73]Tr. 216.

[74]Tr. 212.

[75]Tr. 206.

[76]Tr. 205.

[77]Tr. 206.

[78]Tr. 203.

response to an inquiry from DWS whether Heap "would be able to sit in a workshop or at a job he would not be fired from," Dr. Rogers stated that there would be "no harm in trying."[79]

On July 17, 2006, Dr. Rogers noted that Heap had stubbed his big toe and gone to the emergency room.  His x-rays were okay, but he wanted to increase the Lortab to four times a day due to the recent injuries and pain breakthrough.  Dr. Rogers agreed.[80]

In August 2006, Dr. Rogers noted that Heap was doing well on Lortab four times a day, and his pain was under control.[81]

In September 2006, Dr. Rogers noted that Heap had fallen in the bathtub on August 30 striking his right shoulder and back.  He had interscapular pain and his arms and low back were "feeling funny."[82]  Dr. Rogers had prescribed extra Lortab on August 31.[83]  Examination showed normal deep tendon reflexes, negative straight leg raise testing, sensory-motor functioning intact, tenderness over the interscapular area, and fair range of motion in the right shoulder with minimum tenderness.[84]

On October 9, 2006, Heap reported that he had fallen down the stairs at home on October 7. [85]

---

[79]Tr. 202.

[80]Tr. 199-201.

[81]Tr. 198-99.

[82]Tr. 196.

[83]Tr. 197.

[84]Tr. 197.

[85]Tr. 194-95.

Heap did not see Dr. Rogers again until May 2007.  Dr. Rogers noted that Heap had experienced legal troubles related to drug use.  He had not used narcotics for six months and was undergoing cognitive therapy.  He was taking ibuprofen for back pain and Elavil.  Dr. Rogers informed Heap that he would not prescribe any more controlled substances.[86]  Dr. Rogers also completed another form for DWS indicating that Heap could not work.[87]

### 3.  Jonathan Ririe, Ph.D.

Dr. Ririe performed a psychological evaluation on June 6, 2005 at the request of the agency.[88]  Heap reported that he suffered from back pain, difficulty reading, limited concentration, and difficulty sleeping.[89]  Heap "walked independently into the office with no disturbance of gate, balance or posture."[90]  He was "alert and oriented to person, place, time and situation and was capable of tracking the conversation fully."[91]  His speech was logical.  He used good grammar, and was able to communicate effectively.  He had no difficulty with comprehension, and was able to articulate adequately.[92]  He had difficulty reading the words on the vocabulary subtest, and needed assistance with most words.[93]

_____

[86]Tr. 193.

[87]Tr. 192.

[88]Tr. 139-45.

[89]Tr. 140.

[90]Tr. 143.

[91]Tr. 143.

[92]Tr. 143.

[93]Tr. 143.

On testing, Heap received a verbal IQ score of 84, a performance IQ of 84, and a full scale IQ of 83.  Overall, Heap scored "in the Low Average range of intellectual ability."[94]  He performed in the low average to average range on all subtests except for digit symbol coding in which he performed near the impaired range.[95]  Dr. Ririe's diagnosis was Reading Disorder with a Global Assessment of Functioning (GAF) score of 60.

Dr. Ririe recommended a fundamental reading program.  He noted that Heap had been "able to support himself by choosing jobs in which reading was not a critical factor for him and, likely, he could continue to work, provided he was able to find a job that did not rely heavily upon reading in the process."[96]

### 4.  State Agency Reviewers

#### a.  Psychiatric Review Technique Form

In June 2005, a state agency psychologist reviewed the evidence and completed a Psychiatric Review Technique form finding that Heap suffered from a reading disorder.[97]  He had mild to moderate restrictions of activities of daily living, moderate difficulties in maintaining social function, and mild difficulties in maintaining concentration persistence, or pace.  There was insufficient evidence to rate the category of episodes of decompensation.[98]

---

[94]Tr. 144.

[95]Tr. 144.

[96]Tr. 145.

[97]Tr. 176.

[98]Tr. 182.

### b.  Mental Residual Functional Capacity Assessment

The psychologist also completed a Mental Residual Functional Capacity Assessment finding that Heap had moderate limitations in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others.  In all other categories of work-related mental functioning, the psychologist found that Heap was not significantly limited or that there was insufficient evidence to rate the degree of limitation.[99]

### c.  Physical Residual Functional Capacity Assessment

In June 2005, a state agency physician reviewed the evidence and concluded that Heap had the physical residual functional (RFC) to lift twenty pounds occasionally and ten pounds frequently; sit or stand/walk about six hours each in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl.[100]

---

[99]Tr. 186-87.

[100]Tr. 147-48.

## DISCUSSION

### A.  Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[101]  The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[102]

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[103]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[104]

The Commissioner's decision must be supported by substantial evidence.[105]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

---

[101] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[102] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[103] *Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[104] *Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

[105] *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997).

support a conclusion."[106]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[107]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[108]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[109]  However, the court should carefully examine the record and review it in its entirety.[110]  Failure of the Commissioner to apply the correct legal standard is grounds for reversal.[111]

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)     A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)     A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled.  20 C.F.R. § 416.920(c).

(3)     A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is conclusively presumed to be disabled.  20 C.F.R. § 416.920(d).

---

[106]*Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[107]*Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[108]42 U.S.C. §§ 405(g), 1383(c)(3); *Perales*, 402 U.S. at 390.

[109]*Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996).

[110]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[111]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

(4)     A person who is able to perform work he has done in the past is not disabled.  20 C.F.R. § 416.920(e).

(5)     A person whose impairment precludes performance of past work is disabled unless the Secretary demonstrates that the person can perform other work available in the national economy.  Factors to be considered are age, education, past work experience, and residual functional capacity.  20 C.F.R. § 416.920(f).[112]

## B.  The ALJ's Decision

The ALJ performed the sequential analysis, finding as follows:  (1) Heap has not engaged in substantial gainful activity since the alleged onset date of disability;[113] (2) he has severe impairments including degenerative disc disease and reading disorder;[114]" (3) he does not have an impairment or combination of impairments that meets or equals the listings;[115] (4) he is unable to perform his past relevant work;[116] but (5) he is capable of performing jobs that exist in significant numbers in the national economy.[117]  Examples of jobs that the ALJ found Heap could perform include dowel inspector, semi-conductor bonder, and wafer breaker.[118]  Based on these findings, the ALJ concluded that Heap was not disabled as defined by the Social Security Act.[119]

---

[112]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[113]Tr. 19.

[114]Tr. 19.

[115]Tr. 19.

[116]Tr. 28.

[117]Tr. 29.

[118]Tr. 29.

[119]Tr. 30.

Heap raises two arguments in support of his disability claim:  (1) the ALJ erred at step three by finding that he did not meet or equal Listing 1.04; and (2) the ALJ erred at steps two, four, and five in rating the severity of his impairments, assessing his residual functional capacity, and in finding that he could perform jobs in the national economy despite the VE's testimony that a person who would be off work one-third of the time could not do any job.[120]

## C.  Step-Three Determination

At step three of the analysis, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."[121] Thus, an individual who has an impairment that matches or equals a listed impairment is determined to be disabled and entitled to benefits without further inquiry.[122]  In order to match a listed impairment, all of the criteria of the listing must be met.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[123]

Listing 1.04 provides as follows:

1.04  *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with

---

[120] Plaintiff's Brief in Support of Petition for Review (Supporting Brief) at 2, docket no. 15, filed October 31, 2008.

[121] *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).

[122] *Id.*

[123] *Id.* at 530.

associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

       B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once ever 2 hours;

or

       C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[124]

Heap contends that he meets the requirements of subsection A of this listing.  He asserts that MRI testing reflected herniated discs and degenerative disc disease with foraminal narrowing and stenosis.  Additionally, the MRIs showed disc-bulge focal compressions on the thecal sac, and nerve root impingement.  Finally, Heap alleges that treatment records showed a decreased range of motion in the spine, decreased lower extremity muscle strength, evidence of radiculopathy, and an abnormal gait or limp.[125]

In his decision, the ALJ stated that he had carefully considered Listings 1.04 (Disorders of the Spine) and 12.05 (Mental Retardation) and concluded that Heap's impairments, either

---

[124]20 C.F.R. Pt. 404, Subpt. P., App. 1 (pt. A) § 1.04 (2008).

[125]Supporting Brief at 6.  An abnormal gait or limp is not one of the criteria under Listing 1.04.  However, the inability to ambulate effectively is one of the criteria of 1.04C.  "Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  § 1.00B2b (citation omitted).  Heap clearly does not satisfy this requirement.

singly or in combination, did not meet or equal the listings.[126]  Regarding Listing 1.04, the ALJ

stated:  "Specifically, there is no evidence of nerve root compression, spinal arachnoiditis, spinal

stenosis resulting in pseudoclaudication, or inability to ambulate effectively as required under

Listing 1.04."[127]  Heap states that this finding is clearly contrary to the MRI results and casts

serious doubt on the quality of the ALJ's review.[128]

In response, the Commissioner acknowledges that "there appeared to be some evidence of

impression of the nerve roots and neuroanatomic pain."[129]  The Commissioner argues, however,

that not all of the remaining criteria of subsection A were satisfied.  In particular, the

Commissioner asserts that "the Listing's requirements of motor loss accompanied by sensory or

reflex loss and positive straight-leg raising tests have not been . . . met."[130]

The claimant has the burden at step three to present evidence establishing that his

impairment meets are equals the listings.[131]  Further, the claimant must show that the criteria were

met for a continuous period of at least twelve months (duration requirement).[132]  As the

Commissioner argues, Heap did not carry his burden to show that he met the duration

requirement.

---

[126]Tr. 19-20.

[127]Tr. 20.

[128]Supporting Brief at 6.

[129]Defendant's Answer Brief (Commissioner's Brief) at 12, docket no. 16, filed November 28, 2008.

[130]*Id.*

[131]*Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).

[132]20 C.F.R. § 404.1509.

The Commissioner points out that the medical records cited by Heap in support of his claim of decreased strength and range of motion are all dated almost a year before his alleged onset date.[133]  Indeed, Heap was still working at the time of those examinations.  In contrast, Dr. Rogers, Heap's treating physician, first saw Heap on February 14, 2005, about three weeks before his alleged disability onset date of March 7, 2005.  Dr. Rogers continued to treat Heap over the relevant time period.  Dr. Rogers's treatment notes consistently reflect intact sensation and motor functioning, good strength, normal deep tendon reflexes, and negative straight-leg raising tests.[134]  Thus, there is substantial evidence in the record to support the ALJ's finding that Heap's impairment did not satisfy the listing.

In his reply brief, Heap argues that this court may not consider the Commissioner's step-three arguments because they do not come from the text of the ALJ's decision, and therefore constitute a post-hoc attempt to justify the ALJ's reasoning.[135]  While Heap is correct that post hoc rationale is generally improper,[136] an ALJ's error does not require reversal where his findings elsewhere in the decision "coupled with indisputable aspects of the medical record, conclusively preclude Claimant's qualification under the listings at step three."[137]  In this case, it is clear from the medical records alone that Heap could not satisfy Listing 1.04.  "No reasonable factfinder

---

[133]Tr. 121, 122, 123, 125.

[134]Tr. 170, 197, 206.

[135]Plaintiff's Reply Brief (Reply) at 3-4, 6, docket no. 17, filed December 15, 2008.

[136]*Carpenter v. Astrue*, 537 F. 3d 1264, 1267 (10th Cir. 2008).

[137]*Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005).

could conclude otherwise."[138]  Further, the ALJ's RFC findings that Heap retained the primary postural capacities, i.e., sitting, standing, walking with a sit/stand option, for sedentary work demonstrate that even absent the alleged error, there was no possibility that the ALJ could have found Heap presumptively disabled under Listing 1.04.[139]  Thus, a remand would be purely formalistic, unjustifiably prolonging the administrative proceedings.[140]  Accordingly, any error by the ALJ at step three was harmless.[141]

**D.  Steps Two, Four, and Five**

In his second point, Heap makes a technical and somewhat confusing argument.  First, he seems to argue that at step two of the sequential evaluation, the ALJ should have found that his difficulties in concentrating and maintaining focus constituted a separate "severe" mental impairment in addition to his reading disorder.[142]  However, as the Commissioner points out, the establishment of a "severe" impairment at step two of the analysis is merely a threshold showing that the claimant must make so that the analysis may continue to the next step of the sequential evaluation.  Once the claimant makes a showing of *any* "severe" impairment at step two, as Heap did, the ALJ must continue the evaluation process and consider all impairments, both severe and

---

[138]*Fischer-Ross*, 431 F.3d at 735.

[139]Tr. 21.  *See Fischer-Ross*, 431 F.3d at 735 (holding that the ALJ's RFC findings "conclusively negated the possibility of any finding that Claimant was presumptively disabled under [Listing 1.04]."

[140]*Id.* at 733.

[141]*See id.* at 735.

[142]Supporting memorandum at 8.

nonsevere.[143]  Any error by the ALJ in not finding a specific severe impairment at step two

"became harmless when the ALJ reached the proper conclusion that [Heap] could not be denied

benefits conclusively at step two and proceeded to the next step of the evaluation sequence."[144]

As the Commissioner also points out, the ALJ included Heap's low concentration level in his

RFC assessment at step four.[145]  Thus, any arguable error in not finding Heap's concentration

problems to be a separate severe impairment would have been harmless.[146]

 Next, Heap argues that the ALJ failed to include a "narrative discussion" of how the

evidence supports each of his conclusions as required by Social Security Ruling 96-8p.[147]  He also

asserts that the ALJ failed "to undertake the special mental impairment evaluations required by

20 C.F.R. § 404.1520a(b)(1) & (2)."[148]  Heap argues that these alleged procedural errors not only

require a remand, they demonstrate the ALJ's neglect in his analysis of the evidence of record.[149]

The court finds, however, that the ALJ satisfactorily complied with the requirements to discuss

---

[143]Commissioner's Brief at 17; *see* 20 C.F.R. §§ 404.1520(c), 404.1523.

[144]*Carpenter,* 537 F.3d at 1266; *Hill v. Astrue,* No. 07-4226, 2008 WL 3339174, at *2 (10th Cir. Aug. 12, 2008) (unpublished)("Once the ALJ finds that the claimant has *any* severe impairment, he has satisfied the analysis for purposes of step two.  His failure to find that additional alleged impairments are also severe is not in itself cause for reversal.").

[145]Commissioner's Brief at 17; see Tr. 21.

[146]*See Fischer-Ross,* 431 F.3d at 733-35.

[147]Supporting Brief at 9, 10.

[148]Supporting Brief at 10.

[149]Supporting Brief at 10.

the evidence supporting his conclusions.  Further, contrary to Heap's assertions, the ALJ did

incorporate his findings regarding the psychiatric review technique into his decision.[150]

Next, Heap asserts that the ALJ gave him a more restrictive RFC than is supported by the

findings of Dr. Ririe and the state agency physicians.  However, any overly restrictive findings by

the ALJ would only inure to Heap's benefit, and therefore do not provide a basis for remand.

At the hearing, Heap's counsel questioned the VE concerning the "moderate" mental

restrictions found by the state consultants.  The VE testified that most of the moderate

restrictions would be inapplicable to the sedentary jobs which she had identified.[151]  However,

when counsel defined "moderate" limitations in sustaining a normal workday and workweek to

mean that the individual would be off-task one-third of the time,[152] the VE testified that there

would be no jobs that the individual could perform.[153]

Heap asserts that this testimony is important because "the ALJ's mental RFC restrictions

are more than 'moderate,' but severe in nature."[154]  Heap further states that the ALJ's RFC

assessment omitted any discussion of Heap's absences, or his ability to sustain concentration,

except for limiting him to unskilled work.  He argues that the ALJ's RFC is therefore in conflict

with the DDS finding that Heap's ability to maintain concentration is at least moderately

impaired, as well as Heap's own testimony that the reason he lost his job was that he was not

---

[150]Tr. 20.

[151]Tr. 311-14.

[152]Tr. 311.

[153]Tr. 314.

[154]Supporting Brief at 11.

dependable.[155]  He notes that the DDS consultants did not define "moderately" in terms of days of work that would be missed.  Heap asserts that his ability to work a full-time schedule is a key aspect of his RFC in this case.  He states that the ALJ made no finding on this key issue, but arbitrarily found that Heap has severe mental restrictions in just about every other area of the Mental Functional Capacity Assessment filled out by DDS.[156]  Heap argues that

> because the ALJ's RFC is over-restrictive and arbitrary, and fails to cover the key issue of Mr. Heap's ability to complete a normal workweek without psychological interruptions, despite the moderate restrictions that the DDS physicians placed on Mr. Heap, this issue must be remanded for further consideration and administrative review because the VE testified Mr. Heap was precluded from employment in direct contradiction to the ALJ's ultimate findings at Step Five.[157]

The court rejects this argument as unsupported by the record.  Heap's assertion that the ALJ's mental restrictions were more than moderate, but severe, is unsubstantiated because the ALJ made no such finding.  Further, there is no evidentiary support whatsoever for the proposition that Heap's mental impairments would cause him to miss one-third of the workweek.  While Heap did testify that he was laid off because he was not dependable, the reason he gave for missing work was his back pain.[158]  The ALJ properly considered the limitations imposed by Heap's back pain, finding that his testimony in this regard was not fully credible, and concluding that jobs existed in the national economy that Heap could perform.[159]

---

[155]Supporting Brief at 11.

[156]Supporting Brief at 11-12.

[157]Supporting Brief at 12.

[158]Tr. 261.

[159]Tr. 22-24.

Regarding the VE's testimony, all of the restrictions in the ALJ's RFC determination were contained in the hypothetical.  In response, the VE identified jobs existing in significant numbers in the national economy that a hypothetical individual with those limitations could perform.  Thus, the VE's testimony provided substantial evidence to support the ALJ's finding that Heap was capable of performing work that existed in the national economy.[160]

## ORDER

The ALJ applied the correct legal standards, and his opinion is supported by substantial evidence.  Accordingly, the decision of the Commissioner is **AFFIRMED**.

August 7, 2009.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge

---

[160]*Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996); *Ellison v. Sullivan*, 929 F.2d 534, 537 (10th Cir. 1990).